IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RALPH BIRDSONG, | : | CIVIL ACTION |
| Petitioner, | : | |
| | : | |
| v. | : | |
| | : | |
| JOHN E. WETZEL, | : | NO.  11-4240 |
| Respondent. | : | |

## REPORT AND RECOMMENDATION

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                          October 28, 2021

Before the Court for Report and Recommendation is the petition of Ralph Birdsong, ("Birdsong" or "Petitioner"), a prisoner incarcerated at the State Correctional Institute Phoenix in Montgomery County, Pennsylvania for the issuance of a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.  Birdsong is serving a sentence of life imprisonment following his 1989 conviction in the Philadelphia Court of Common Pleas on two counts of first-degree murder.[1]  He was sentenced to a consecutive period of imprisonment of 52½ to 105 years for several other serious crimes committed in the same incident, including rape.  By his counseled amended petition he seeks habeas review of his convictions on a variety of grounds, many of which involve assertions of ineffective assistance of counsel at trial and on appeal.  For the reasons set out below, we recommend that the petition be denied.

---

[1]  Birdsong was initially sentenced to death for these crimes, and he was on death row when he initiated this action.  His death sentence was subsequently vacated, however, and he has been re-sentenced in state court to life imprisonment for the convictions of first-degree murder.

## I.     FACTUAL AND PROCEDURAL HISTORY

### A.     Factual history

The picture that emerged at the trial of Petitioner and his brother Anthony Birdsong is one of a horrific and vengeful criminal attack on the occupants of a Philadelphia drug house on July 17, 1988.   The Pennsylvania Supreme Court opinion on direct appeal provides the following summary:

> Gregory Johnson, who lived at 5723 North 17th Street, testified that he was seated at the dining room table ingesting crack cocaine in the early morning hours of July 17, 1988. Hassan Holmes and Kim Glenn were also present. The doorbell rang, and Holmes arose and observed through a window that [Petitioner], also known as "Hakeem," was at the front door. At that point, Johnson arose from the table to admit [Petitioner], whom he had known for ten years. [Petitioner] then entered the house, walked by Johnson, turned around, and shot Johnson in the back of the head with a shotgun. Although the impact of the shotgun blast caused Johnson to fall to the floor, he was nevertheless able to get up and run out of the house.
>
> Hassan Holmes corroborated the testimony of Johnson by identifying [Petitioner] as the person who rang the doorbell on July 17, 1988. Holmes assumed that [Petitioner] wished to purchase drugs from Johnson, who was a dealer. After seeing Johnson shot, Holmes attempted to flee to the basement, but [Petitioner] intercepted him and shot him in the shoulder. Holmes then heard James Bagwell, who was sleeping on the living room couch, get off the couch and attempt to flee to the basement. However, [Petitioner] intercepted Bagwell and fatally wounded him as he ran down the stairs. Shortly thereafter, Holmes managed to flee from the house.
>
> Additionally, Andre Kinard testified that he saw [Petitioner] shoot Bagwell in the head as Bagwell was running down the basement stairs attempting to flee. Kinard then tried to flee, but [Petitioner] shot him as well.
>
> Kim Glenn also testified that [Petitioner], whom she had known for one and one-half years, rang the doorbell that morning. Glenn was able to identify [Petitioner] because she had sold drugs for him in the past. Glenn hid under the dining room table as [Petitioner] proceeded to shoot Johnson, Holmes, and Bagwell. When [Petitioner] went upstairs, Glenn hid under a mattress in the front of the house. From there she heard a second man enter the house and warn [Petitioner] about the police. [FN 8: Glenn

recognized the man's voice as that of the co-defendant, Anthony Birdsong.]

The Commonwealth presented the testimony of Monroe Clark, who testified that he was in the second floor bedroom with Gloria Pannell when [Petitioner] kicked in the bedroom door. [Petitioner] fired shots, but missed Clark. [Petitioner]'s shots hit Pannell. After leaving the room for a brief instant, [Petitioner] reentered the room and fatally shot Pannell while standing over her as Clark hid in the bedroom closet.

Fifteen-year old Quinzell Pannell testified that he, his brother Albert, and his sister [Y.P.[2]] were in another bedroom when [Petitioner] entered and struck them repeatedly with the butt of his gun. [FN 9: Quinzell knew [Petitioner] from an incident that occurred a few weeks earlier in which [Petitioner] pistol-whipped Glenn, Clark, and other household members.] After beating the children, [Petitioner] then directed them into another bedroom. On the way, [Petitioner] struck Quinzell in the back of the head causing Quinzell to fall to the floor. Next, [Petitioner] took Albert out of the room and shot him. [Petitioner] then returned, stated "I am going to rape you, bitch," and took Y.P. out of the room. (N.T. 10/24/89, 284-85).

Y.P. corroborated the testimony of Quinzell. She also testified that [Petitioner] forced her out of the house and across the street to a park where he proceeded to rape and sodomize her. By stipulation, the results of the rape kit taken at the hospital were admitted, showing the presence of sperm in Y.P.'s vagina and rectum. (NT 10/25/89, 399).

Albert Jones testified that [Petitioner], whom he had known for sixteen years, showed up at Jones' apartment in the early morning hours of July 17, 1988, with blood on his hands and the back of his legs. [Petitioner] then requested a ride to pick up his car and Jones assented. When the two arrived at the driveway where [Petitioner]'s truck was located, they were stopped by Detective Thomas Augustine.

Detective Augustine testified that when he stopped Jones, the passenger in Jones' car, who was later identified as [Petitioner], looked very nervous. Detective Augustine noticed a jacket under the passenger seat, picked it up, and felt a magazine from a gun. When Detective Augustine asked whose jacket it was, [Petitioner] admitted it was his, but fled the scene when Detective Augustine indicated that he would like the two men to come with him. Through continued questioning of the driver, Detective Augustine adduced that the passenger was [Petitioner]. Additionally, upon further

---

[2] Throughout this opinion, and including our quotations from the state court opinions, we will refer to this minor victim of a sexual assault by her initials only.

investigation, the detective discerned that the jacket contained an empty magazine from a .45 caliber handgun.

*   *   *

The parties stipulated that the jacket recovered from Jones' automobile was stained with human blood. It was further stipulated that Gloria Pannell and James Bagwell died of multiple gunshot wounds. Finally, it was stipulated that Albert Pannell suffered a gunshot wound to the back of the head which rendered him permanently disabled and confined to a wheelchair.

*Commonwealth v. Birdsong*, 650 A.2d 26, 28-30 (Pa. 1994) ("*Birdsong-I*").

## B.   Procedural history

### 1.   State court proceedings

After his flight from police at the scene of the July 17, 1988 shootings, Petitioner made his way to Florida, where he was discovered and arrested on November 14, 1988. *Id.* at 29-30. His brother, Anthony Birdsong ("Anthony"), was also arrested in Florida a short time later and brought to Philadelphia to face charges as Petitioner's alleged "look-out" when these crimes were committed.[3] The Commonwealth sought to try the two brothers together, and they appeared jointly for pre-trial proceedings in the Philadelphia Court of Common Pleas on October 18, 1989. At that listing, both defendants waived the right to a jury trial, citing their concerns about jury partiality, which they attributed to pre-trial publicity. *Id.* at 30. Accordingly, they proceeded to a joint bench trial, which commenced before the Honorable Juanita Kidd Stout on October 20, 1989. On October 27, 1989, Judge Stout convicted both brothers of two counts of first-degree murder, six counts of aggravated assault, criminal conspiracy, and possession of an instrument of crime. She additionally convicted Petitioner of rape and involuntary deviate sexual intercourse for the crimes against Y.P.

---

[3] Anthony Birdsong faced the same charges as Petitioner except for the rape and involuntary deviate sexual intercourse charges. The Commonwealth sought a capital sentence in his case as well.

4

Petitioner waived his right to a jury as to the penalty phase.  Justice Stout ultimately found two aggravating circumstances and no mitigating circumstances applicable.  She thus sentenced Petitioner to death for first-degree murder, in addition to the 52½ to 105 years prison term she imposed for his other crimes in the aggregate.  *Id.*[4]  The court denied Petitioner's post-verdict motions on April 10, 1990.

Attorney Scott O'Keefe, who represented Petitioner at trial and on post-verdict motions, then withdrew from the case.  Attorney Marlene S. Cooperman entered her appearance for Petitioner's appeal to the Pennsylvania Supreme Court.  The appeal raised a number of challenges as to the effectiveness of prior counsel concerning guilt phase issues.  It also alleged that the trial court abused its discretion at the sentencing phase and in denying a request for a continuance concerning a post-verdict motion.  In an opinion rendered on November 9, 1994, the state supreme court affirmed the trial court's judgment of sentence.  *Birdsong-I*, 650 A.2d 26 (Pa. 1994).

On January 17, 1996 Petitioner filed a timely *pro se* petition pursuant to the Post Conviction Relief Act, 42 Pa. Cons. Stat. §§ 9541-9546 ("PCRA").  He eventually came to be represented by Attorney Billy Nolas, who filed an amended PCRA petition on April 1, 1997. Following the death of Justice Stout, the PCRA matter was assigned to the Honorable Carolyn Engel Temin, who heard argument on the Commonwealth's motion to dismiss the PCRA petition in November 1998.  Shortly thereafter, the case was re-assigned to the Honorable John J. Poserina,

---

[4]  The court did not impose a death sentence on Petitioner's brother Anthony.  For his convictions of first-degree murder, he receive two consecutive life sentences.  For his convictions of possession of an instrument of crime, six counts of aggravated assault, and criminal conspiracy, he received an aggregate additional term of imprisonment of 42½ to 85 years. *See Commonwealth v. Birdsong*, 24 A.3d 319, 325 n.2 (Pa. 2011) (recounting Anthony's convictions and affirmance on direct appeal by the Superior Court); Doc. 50 at 208-09.

Jr.  He held an evidentiary hearing over nine days between September 1999 and January 2000 but on February 26, 2001 dismissed the PCRA petition.

Petitioner did not file a notice of appeal of the dismissal within the required time period, but he was ultimately able to secure the reinstatement of his right to appeal the PCRA dismissal to the Pennsylvania Supreme Court *nunc pro tunc*.  The Supreme Court then remanded to the lower court for preparation of an opinion, which had not accompanied the PCRA dismissal order.  During this time Petitioner also added, and then deleted, a new claim under *Atkins v. Virginia*, 536 U.S. 304 (2002), the case in which the United States Supreme Court prohibited execution of convicted persons with intellectual disabilities. Once the *Atkins* issue was disposed of, the state supreme court considered a variety of guilt- and penalty-phase issues presented by Attorney Nolas and colleagues at the local office of the federal defender.  On May 26, 2011, the court affirmed the dismissal of his PCRA petition.  *Commonwealth v. Birdsong*, 24 A.3d 319, 350 (Pa. 2011) ("*Birdsong-II*").  Petitioner unsuccessfully sought re-argument in the Pennsylvania Supreme Court.

### 2.    Federal court proceedings

On June 29, 2011, the Federal Defender Office's Capital Habeas Unit sought appointment as counsel for Petitioner in this Court.  It presented a motion to stay execution and a *pro se* form habeas petition completed by Birdsong and dated June 10, 2011.  (Doc. 1.)  The court granted the appointment and issued a stay of execution.  (Docs. 3, 5.)  Counsel filed a comprehensive habeas petition on April 27, 2012 setting forth eleven grounds for relief, followed by a Memorandum of Law in support of the petition on May 15, 2013.  (Docs. 9, 25.)  The Philadelphia District Attorney's Office filed its response to the petition on June 2, 2015. (Doc. 50.)  Petitioner filed a reply brief on December 21, 2015.  (Doc. 61.)

Following a period of discovery, the parties presented the Court with a stipulation that trial counsel had been ineffective for failing to investigate, develop, and present available mitigating evidence at the capital sentencing phase of trial, as alleged in Claim V of the counseled petition. On January 2, 2020, the Honorable Judge Jeffrey L. Schmehl approved the stipulation and granted Petitioner relief from the death penalty.  (Doc. 102.)  The petition was then referred to us for preparation of a Report and Recommendation concerning the remaining guilt-phase issues. (Doc. 104.)

We read the petition before us at this stage, e.g., relating only to the guilt phase of trial, to assert seven claims.  Petitioner's grounds for relief allege (1) bias on the part of the trial judge, (2) interference with his right to counsel of his choice, (3) an improper joint trial with his brother, (4) *Brady* violations by the Commonwealth, and (5) ineffective assistance of counsel with respect to the venue of his trial, (6) defense tactics, and (7) defense counsel "exposure" of some of his prior bad acts.  Before addressing those claims in the Discussion section below, we describe the legal doctrines that will inform our review.

## II.    LEGAL STANDARDS

We first set out the standard of review for claims that were adjudicated on the merits in state court.  We then set out a petitioner's obligation to exhaust state court remedies.  Finally, we describe the standard under which claims of ineffective assistance of counsel are evaluated, as almost all of his claims invoke that right in some respect.

### A.    Standards for state-adjudicated claims

Where a cognizable federal claim presented in a federal habeas petition adjudicated on the merits in the state courts, the federal court may grant habeas relief only if the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

7

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Where we do consider a claim that has been exhausted, we show deference to the state court, as a "determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  The burden rests with the Petitioner to overcome this presumption "by clear and convincing evidence."  *Id.*

A writ may issue under the "contrary to" clause of Section 2254(d)(1) only if the "state court applies a rule different from the governing rule set forth in [United States Supreme Court] cases or if [the state court] decides a case differently than [the United States Supreme Court has] done on a set of materially indistinguishable facts."  *Bell v. Cone*, 535 U.S. 685, 694 (2002).  A writ may issue under the "unreasonable application" clause only where there has been a correct identification of a legal principle from the Supreme Court but the state court "unreasonably applies it to the facts of the particular case."  *Id.*  This standard requires the petitioner to demonstrate that the state court's analysis was "objectively unreasonable."  *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).

### B.    Exhaustion and procedural default

Respondents challenge certain of Petitioner's claims as procedurally defaulted.  Assuming that a claim is cognizable, relief is ordinarily available only for a claim where the petitioner has exhausted the corrective processes available in the state courts.  *See* 28 U.S.C. § 2254(b)(1).  It has long been recognized that a petitioner satisfies this obligation and gives the state courts a full and fair opportunity to resolve a federal constitutional claim only when he "fairly presents" his claim in "one complete round of the state's established appellate review process."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

Where a claim was not properly presented to the state court, the petitioner is considered to have defaulted that claim. *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 749 (1991). Such a claim cannot provide a basis for federal habeas relief unless the petitioner can show "cause for the default and actual prejudice as a result of the alleged violation of federal law, or [unless he] demonstrates that failure to consider the claims will result in a fundamental miscarriage of justice." *Id.* at 750; *see also Teague v. Lane*, 489 U.S. 288, 308 (1988) (plurality opinion); *Wainwright v. Sykes*, 433 U.S. 72 (1976). To establish cause, the petitioner must show "that some objective factor external to the defense impeded [his] efforts to comply with the State's procedural rule" in the presentation of the claim to the state court. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). The fundamental miscarriage of justice exception requires that the petitioner supplement his claims with a "colorable showing of factual innocence" in order to obtain review of the defaulted constitutional claim. *McCleskey v. Zant*, 499 U.S. 467, 495 (1991).[5]

Federal review of a constitutional claim may also be precluded by the "independent and adequate state law" doctrine. As the Supreme Court has explained, "[a] federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Walker v. Martin*, 562 U.S. 307, 315 (2011) (*quoting Beard v. Kindler*, 558 U.S. 53, 55 (2009)). The Court has noted that "[t]he adequate and independent state ground doctrine furthers that [same] objective" as the exhaustion requirement. *Id.* In both cases, the doctrines can operate as a bar to review of the constitutional claim presented in the habeas petition.

---

[5]   Inasmuch as Petitioner does not purport to have presented a colorable showing of factual innocence, when we consider below whether he has provided the Court with a basis to excuse the procedural default of any of his claims, we consider only the "cause and prejudice" exception.

### C.        Ineffective assistance of counsel: the *Strickland* standard

The Supreme Court employs the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984), to determine whether a defendant was deprived of his right to counsel as guaranteed by the Sixth Amendment.   Pursuant to *Strickland*, a defendant who raises claims based on the ineffective assistance of his counsel ("IAC") must prove that (1) "counsel's representation fell below an objective standard of reasonableness," and (2) there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694.

To satisfy the first prong of the *Strickland* test, a defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."   *Id.* at 687.   In evaluating counsel's performance, a reviewing court must be "highly deferential" and must make "every effort ... to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."   *Id.* at 689.   Moreover, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"   *Id.*

To satisfy the second prong of the *Strickland* test, the defendant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."   *Id.* at 694.   "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding.   *Id.*   It follows that counsel cannot be ineffective for failing to pursue meritless claims or objections.   *See, e.g., United States v. Sanders,* 165 F.3d 248, 253 (3d Cir. 1999); *United States v. Fulford,* 825 F.2d 3, 9 (3d Cir. 1987).

We note here that at the time of Petitioner's direct appeal from 1990-1994, Pennsylvania's rules requested that a defendant present claims of IAC by the trial counsel upon obtaining new counsel. *See Commonwealth v. Hubbard*, 372 A.2d 687 (Pa. 1977). In 2002, the Pennsylvania Supreme Court announced a new rule, requiring defendants to defer IAC claims involving trial counsel until collateral review. *See Commonwealth v. Grant*, 813 A.2d 762 (Pa. 2002).

## III.   DISCUSSION

Seven claims for relief asserted in the counseled petition implicate guilt-phase concerns and remain for disposition following the resolution of the challenges to the death sentence previously imposed. We have re-ordered our presentation of the claims to roughly correspond with the phases of the trial investigation and process that they concern and will address them in the following order. In Claim IV, Birdsong alleges a violation of his Sixth, Eighth, and Fourteenth Amendment rights where he believes the trial judge should have recused herself. (Pet., Doc. 9, at 63.) In Claim VII, he asserts that he was denied his Sixth and Fourteenth Amendment right to counsel of his choice. (*Id.* at 69.) In Claim X, he asserts that his Sixth, Eighth and Fourteenth Amendment rights were violated by the joint trial and sentencing with his brother, and that counsel was ineffective for failing to file a motion to sever. (*Id.* at 93.) In Claim III, he contends that trial counsel ineffectively failed to move for a change of venue. (*Id.* at 62.) In Claim VIII, he asserts a violation of his right to due process as recognized in *Brady v. Maryland*, 373 U.S. 83 (1963), where he contends the Commonwealth withheld evidence favorable to the defense in four respects. (*Id.* at 73.) Finally, Petitioner asserts two ineffectiveness claims concerning the performance of counsel once trial had begun. In Claim XI, he asserts that counsel was ineffective for eliciting testimony about his prior bad acts during cross-examination of Commonwealth witnesses. (*Id.* at 95.) In Claim IX, he advances the claim that "counsel failed to impeach important Commonwealth

witnesses, pursued an implausible theory of defense and generally failed to test the Commonwealth's case." (*Id.* at 81.)   As to several of these claims, Birdsong's failure to have presented the claim to the state court at the proper juncture means that he must now further demonstrate that the waiver of the underlying claim reflects deficient performance by trial and/or appellate counsel.

### A.    Layered claim of ineffectiveness as to whether the trial judge should have recused herself

In Claim IV, Birdsong asserts that his Sixth, Eighth and Fourteenth Amendment rights were violated "when the trial judge failed to recuse herself, or in the alternative, failed to consider mitigating evidence of which she was aware."   (Pet. at 63.)[6]   The claim is premised on the contention that in the course of Justice Stout's prior tenure as a family court judge, she "was exposed to a great deal of extra-record evidence and information about Petitioner and his family, including in juvenile prosecutions against various members of the Birdsong family." (Doc. 25 at 39.)    Birdsong alleges that Justice Stout should have recused herself.  (*Id.* at 39.)  He further alleges that trial counsel was ineffective in failing to reasonably learn about Justice Stout's "prior dealings with the family" and to move for her recusal, and that subsequent counsel were ineffective for failing to assert trial counsel's ineffectiveness.  (*Id.* at 39-40.)  He contends that "[t]he nature of" her prior exposure to the family, her "complete failure to disclose it," and her rulings and verdicts at trial, "taken together, all demonstrate judicial bias here."  (*Id.* at 45.)

---

[6] As initially presented, this claim implicated both the penalty and guilt phases of his trial.  With respect to the sentencing aspects of this claim, Petitioner asserted that he was denied his Eighth Amendment right "to have his sentencer consider all mitigating evidence because Judge Stout failed to consider and give effect to the mitigating information known to her about Petitioner's family background."  (*Id.* at 40.)  *See also id.* at 39 (referring to her exposure to evidence relevant to his "lack of parental supervision, childhood history, upbringing, family history, educational failure, and drug use").  This aspect of the claim has been mooted by the sentencing relief Petitioner has obtained.

As Petitioner's pleadings acknowledge, this concern of bias was never presented to the state court at the time of trial. Nor was the claim of ineffective assistance of trial counsel for failure to seek recusal among the IAC claims presented to the Pennsylvania Supreme Court on direct appeal. Both of those claims – recusal, and IAC of trial counsel for failure to seek recusal – were deemed waived by the state court when Birdsong presented them on PCRA review. *Birdsong-II*, 24 A.3d at 329 (citing 42 Pa. Cons. Stat. § 9544(b), which defines an issue as waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal, or in a prior state postconviction proceeding"). Those claims are thus considered procedurally defaulted for habeas review. The trial counsel IAC claim could be reviewable only if Petitioner could demonstrate that the default of that claim was "caused" by ineffective assistance of appellate counsel and that he would be prejudiced by the Court's failure to consider the underlying claim.

The opportunity to have developed this assertion of "cause" for the default was in the PCRA litigation, and Petitioner *did* make these allegations there. The state appellate court, however, found that while he presented argument on his underlying claim of trial error and trial counsel's ineffectiveness in this regard, the development of the remaining inquiry regarding appellate counsel's stewardship was "cursory." *Id.* at 330. Ultimately, the court found that the underlying claim of trial court error and trial counsel ineffectiveness failed, such that his claim of appellate counsel's ineffectiveness was "necessarily defeated as well." *Id.* With respect to the underlying issue of whether the trial judge should have recused herself on the basis of bias, the court noted that Birdsong, as the party requesting recusal, bore the burden "to produce evidence establishing bias, prejudice or unfairness which raises a substantial doubt as to the jurist's ability to preside impartially." *Id.* (citation omitted). The court found the evidence presented by Birdsong

at the PCRA hearing to be "paltry and insubstantial," consisting of an inadmissible affidavit by Birdsong's then-deceased father and unsworn statements of some of his siblings that "made only vague claims they remembered the trial judge presiding over some of their siblings' family court cases." *Id.* at 331. The court found that the adverse rulings of which Petitioner complained and other actions by Justice Stout – allegedly "suggest[ing]" he and his brother intimidated witnesses, denying his multiple requests for continuances to obtain witnesses, denying his requests to recall witnesses, and sentencing him to death – "demonstrate nothing more than the judge's efforts to manage the trial and her courtroom." *Id.* at 331 & n.11.

Petitioner argues in his filings here that the court's ruling was "unreasonable, and incorrect, on its face," noting that he also presented a declaration and testimony from an attorney who had personal knowledge of Justice Stout's exposure to Birdsong family cases during her earlier tenure in the family court division. Our review of the testimony of Attorney S. Timothy Crawford, however, fails to support the notion that Justice Stout became biased or prejudiced against Petitioner, nor that any prior exposure she had to juvenile court cases years earlier would have influenced her rulings or trial management in any way. Birdsong points to no judicial comments or rulings that would establish the unreasonableness of the state courts' analysis of this recusal claim. In these circumstances, we certainly cannot say that the state courts' rejection of the layered claim of ineffective assistance of appellate counsel as to this issue was an unreasonable application of *Strickland*. Claim IV thus does not provide a basis to set aside Petitioner's convictions.

### B.      Layered claim of ineffectiveness as to alleged denial of counsel of his choice

In Claim VII, Birdsong asserts that his Sixth Amendment right to the counsel of his choice was infringed upon when the Commonwealth seized assets that he contends he would have used

to pay retained counsel.[7]  He complains that when the Commonwealth initiated civil forfeiture proceedings against him for seizure of personal and real property associated with unrelated drug charges pending against him, he lost the ability to pay Attorney Crawford,[8] the private attorney he had retained and who had represented Birdsong and family members in prior cases.  He contends that he was forced to rely upon appointed counsel, who he claims was inadequately compensated and lacked the necessary resources to defend him in his multiple criminal prosecutions and forfeiture actions.

Like the claim involving recusal, this claim could have been, but was not, presented on direct appeal.  Birdsong attributes this deficiency to trial counsel, and he contends further that appellate counsel was ineffective for failing to raise this aspect of trial counsel's alleged ineffectiveness.  He first presented this issue on PCRA review.  The PCRA Court considered the claim non-cognizable.  In the appeal of the dismissal of his PCRA petition, however, the state supreme court viewed the claim as a cognizable one of ineffective assistance of appellate counsel. It determined, however that the appellate counsel ineffectiveness claim failed, in that the underlying claim was without merit.

Birdsong contends that the state court's adjudication was based on state law and "failed to address any federal constitutional violations."  (Pet'r Reply, Doc. 61, at 30.)  He maintains that the forfeiture in his case was unconstitutional because the Commonwealth's motive for seizing the property was to prevent him from hiring the counsel of his choice.  (*Id.* at 32.)  He asserts that the

---

[7]  Birdsong's petition indicates that the Commonwealth filed TROs and petitions for forfeiture "within fourteen days after the homicides."  (Pet., Doc. 9, ¶ 209.)  He also identifies further restraining orders that the Commonwealth sought as to a series of other pieces of real estate or personal assets.  (*Id*. at 72 n.5.)

[8]  This is the same individual who testified at the PCRA hearing about Justice Stout's prior familiarity with Petitioner from various Family Court proceedings.

Commonwealth never pursued drug charges against him for drugs tied to the assets that it seized in the fall of 1988 but rather only ever charged him, post-seizure, with selling cocaine "from within the jail." (*Id. But see* Pet., Doc. 9, at ¶ 210 (noting that around this time he faced two aggravated assault cases, another capital murder prosecution, and a cocaine trafficking charge).) He argues that the timing of the forfeiture action shows that the Commonwealth seized his assets without intending to pursue drug charges against him and contends that "[t]he Commonwealth took [these] steps to ensure that Petitioner would not have assistance from Crawford – Petitioner's attorney-of-choice – at any trial." (Pet., Doc. 9, at ¶ 208.)

Shortly before Birdsong's trial, the United States Supreme Court issued decisions describing this right to counsel of one's choice. In *United States v. Monsanto*, 491 U.S. 600 (1989) and *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1989), the Supreme Court addressed whether a criminal defendant's Sixth Amendment right to counsel of his choice was compromised by the government exercise of statutory powers to freeze assets that had been shown, by probable cause, to be forfeitable by statute. In *Caplin*, the Court made clear that the federal forfeiture statute relied upon in that case did not "impermissibly burden" the defendant's Sixth Amendment right to retain the counsel of his choosing. The Court explained that a defendant lacks any Sixth Amendment right to spend for an attorney's services money that is forfeitable because of a criminal act.

In light of the precedents concerning forfeiture of assets and the right to retain counsel, we cannot see how counsel could have been constitutionally ineffective in failing to assert this alleged violation of Birdsong's Sixth Amendment rights. Petitioner's arguments, which are rife with hyperbole and conjecture, are not compelling in this regard. Petitioner and his family had prior contacts with Attorney Crawford from the juvenile justice system, and Petitioner engaged him

16

with respect to several business properties.  While we would not be surprised if he intended to use Crawford to defend him when facing this prosecution, we are not inclined to accept the notion, on this evidentiary record, that the Commonwealth engaged in an improper forfeiture action as part of a concerted effort to separate Birdsong from Crawford.  Thus, for trial counsel to make an appellate issue of this in the direct appeal to the Pennsylvania Supreme Court would hardly have been required under professional norms.  Without a strong case that the Commonwealth transgressed with respect to the seizure of Petitioner's assets leading up to trial, we cannot say that appointed counsel was ineffective in failing to raise this Sixth Amendment issue with the state courts.  Appellate counsel could not be deemed ineffective for failing to have asserted that trial counsel was ineffective in not presenting this Sixth Amendment right to counsel claim to the trial judge.  The Pennsylvania Supreme Court's rejection of this claim in the PCRA appeal, where it would also have to have considered the alleged ineffectiveness of appellate counsel, was thus not unreasonable.

### C.   Layered claim of ineffective assistance concerning joint trial with co-defendant Anthony Birdsong

In Claim X of his petition, Birdsong contends that the joint trial with his brother was improper.  As no such argument was presented by Birdsong during his trial, he characterizes trial counsel as ineffective for failing to make this argument on his behalf.  And again, inasmuch as appellate counsel did not include this claim on direct appeal when she could have, Birdsong necessarily contends that she too was ineffective.

This claim, nominally layered as one of ineffective assistance of trial and appellate counsel, was first presented to the state court on PCRA review.  The PCRA Court concluded that Birdsong had not established how the outcome of his trial would have different had he been tried separately from his brother, where "the undisputed evidence, including numerous eye-witnesses, placed [him]

at the scene of the crime as the shooter and the rapist." *Birdsong-II*, 24 A.3d at 337 (quoting PCRA Ct. Opin., 3/25/04, at 19-20).  Birdsong pursued this issue in his PCRA appeal to the Pennsylvania Supreme Court, arguing that Anthony's defense portrayed him as the driving force behind the crimes and that Anthony's defense theory was so antagonistic to his defense that the two were irreconcilable and were mutually exclusive.  He also contended that Anthony's cross-examination of Commonwealth witnesses emphasized their identification of Petitioner as well as his prior bad acts.  He also believed that *he* was tainted by evidence presented that *Anthony* had tampered with a witness.

Rejecting this claim on appeal of the dismissal of the PCRA petition, the Pennsylvania Supreme Court noted that "[j]oint trials are favored when judicial economy will be served by avoiding the expensive and time-consuming duplication of evidence, and where the defendants are charged with conspiracy." *Birdsong II*, 24 A.3d at 336.  The court cited several of its precedents for the proposition that "the mere fact" of hostility between defendants is not sufficient grounds to require separate trials, and that a defendant who claims that there is a possibility of conflicting or antagonistic defenses "must show a real potential for prejudice and not mere speculation." *Id.* (citations omitted).  The court determined that Birdsong failed to meet his burden in this regard. It found that, inasmuch as "[e]ach co-defendant attempted to minimize his own role in the crime and make the other appear to be the instigator" – which is "a common strategy" and "a reason for, not against, a joint trial" – Birdsong had not demonstrated that he was prejudiced by being tried jointly with Anthony. *Id.* at 336-37. As the underlying severance claim lacked merit, the state court found that he could not prevail on his claims of trial counsel ineffectiveness, nor was there a need to develop a record as to any alleged ineffectiveness by appellate counsel in this regard.

Birdsong argues here that the state court's conclusion was contrary to and an unreasonable application of federal law as reflected in *Zafiro v. United States*, 506 U.S. 534 (1993), and *United States v. Lane*, 474 U.S. 438 (1986).  In *Zafiro*, the Supreme Court was tasked with reconciling two federal rules of criminal procedure applicable to that particular multi-defendant federal criminal prosecution:  Rule 8(b), which provided that defendants could be charged together "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses," and Rule 14, which permits a district court to grant a severance of defendants if "it appears that a defendant or the government is prejudiced by a joinder."  One of the defendants in *Zafiro* argued that Rule 14 required severance as a matter of law when codefendants present "mutually antagonistic defenses." *Zafiro*, 506 U.S. at 535.  The Court ultimately affirmed the lower court's denial of the severance motion, finding no violation of the criminal rules.  It did not purport to address any constitutional implications. *Lane,* too, involved an analysis of the federal criminal procedure rules, and the specific question of whether misjoinder under Rule 8(b) was subject to harmless error analysis or whether it was reversible error *per se*. The only reference to constitutional requirements was in a remark that "the specific joinder standards of Rule 8 are not themselves of constitutional magnitude," which was followed by this footnote, containing no citation or further explanation:

> FN 8: Improper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial.

*Lane*, 474 U.S. at 446 n.8.

Birdsong argues that these cases are pertinent to his severance claim because "the principles concerned the federal constitutional issue of when misjoinder violates the right to a fair trial."  (Pet'r Reply, Doc. 61, at 46.)  But Birdsong was not tried in federal court where these

procedural rules were applied.  And counsel representing him in the Court of Common Pleas and before the Pennsylvania Supreme Court could not expect to direct those state courts to the Federal Rules of Criminal Procedure for authority.

Looking at this claim as one of *Strickland*, Birdsong also argues that the Pennsylvania Supreme Court invoked the incorrect prejudice standard when it considered this claim on PCRA appeal, inasmuch as it stated that Petitioner failed "to establish how the outcome of his trial would have differed" had he been tried separately.  *Birdsong-II*, 24 A.3d at 337.  He argues that "[t]he proper Strickland prejudice inquiry is whether there is a reasonable likelihood of a different outcome; it does not require petitioner to 'establish' a different outcome."  (Pet'r Br., Doc. 25, at 121.)

Again, we do not find this argument compelling.  Petitioner identifies no evidence admitted at trial that would not have been admitted if his trial had been severed.  While he points out that Anthony's counsel sought to shift blame to him and that Anthony presented "other crimes evidence," we are not persuaded that any of this evidence was reasonably likely to have impacted the verdict.  Respondents provide the more compelling view that Birdsong's joint trial satisfied even the standard suggested by the *Lane* Court in its dicta.  The joint trial did not "result in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial."  *Lane*, 474 U.S. at 446 n.8.  The defenses of Petitioner and his brother were not mutually antagonistic, inasmuch as the fact finder was not required to disbelieve the defense of one brother to believe the defense of the other.

Finally, as we consider the claims that counsel chose to pursue at trial and in appellate challenges as to the question of deficient performance by counsel, we are mindful that a severance motion had already been filed pre-trial – by *Anthony* Birdsong – and it had been denied.  And if

*Anthony's* request had been denied, where he played a less significant role in the crimes than Petitioner, there could have been no reasonable expectation that Petitioner could succeed on such a motion. *See also* N.T. 9/14/99 at 35 (trial counsel's testimony at PCRA hearing that he viewed Anthony Birdsong as having suffered most as a result of the joinder). Therefore, we have no trouble recommending that relief not be granted on this layered claim of ineffectiveness concerning the joint trial.

### D. Layered claim of ineffective assistance where trial counsel failed to move for a change of venue

Birdsong contends in Claim III of his petition that his Sixth and Fourteenth Amendment rights were violated "when trial counsel ineffectively failed to move for a change of venue and direct appeal counsel ineffectively failed to reasonably challenge trial counsel's ineffectiveness." (Pet. at 62, § III.) His claim builds upon claims asserted on both direct appeal and on PCRA review. He presented on direct appeal a challenge to trial counsel's failure to move for a change of venue due to extensive coverage his case received in Philadelphia *newspapers*. On PCRA review he faulted appellate counsel for failing to support the basis for the venue change with reference to *electronic media* coverage, e.g., television and radio, which he contends "not only compounded the print media, but was significantly more harmful." (Pet'r Br., Doc. 25, at 35.) He contends that these deficiencies by counsel left him in a position where he waived his right to a jury trial "in a vain attempt to avoid the prejudice from" extensive pretrial publicity. (*Id.* at 32.) He argues that the state court's resolution of these claims when presented on direct review and on PCRA were unreasonable as to the prejudice prong of *Strickland*, as the trial record made clear that he had waived his right to a jury trial based on the prejudicial pretrial publicity. He argues that reasonable litigation of the venue issue by trial counsel "would have obviated the need for this waiver." (Pet'r Br. at 36.) He also contends that trial counsel's asserted strategy as to the question

of venue – that there were risks to receiving a jury from a more remote area – should not receive *Strickland* deference where it was based on an incomplete assessment by counsel as to the full extent of the prejudicial media coverage.  (*Id.* at 38.)  Respondents contend that the state courts' adjudications on both direct and PCRA review were not unreasonable where a change of venue would not have been proper, trial counsel articulated a reasonable strategic basis for declining to pursue a venue change, and Birdsong was not prejudiced by the bench trial held in Philadelphia. (Resp., Doc. 50, at 90.)

Pursuant to the precedential state case law at the time of trial in 1989, a change in venue due to pre-trial publicity may have been warranted if the publicity was "sensational, inflammatory, slanted towards conviction rather than factual and objective; revealed that the accused had a criminal record; referred to confessions, admissions, or reenactments of the crime by the accused; or derived from reports from the police and prosecuting officers."  *Commonwealth v. Pursell*, 495 A.2d 183, 187 (Pa. 1985).  If any of those factors were present, then the publicity would be deemed to be inherently prejudicial, but the court would then have considered whether the community had been "saturated" with the publicity and whether, notwithstanding the saturation with inherently prejudicial publicity, the passage of time sufficiently dissipated the prejudicial effects of the publicity.  *Id.* at 188.

When it considered on direct appeal this issue of prejudicial publicity, the Pennsylvania Supreme Court considered the effects of newspaper articles exclusively, as that was how the issue was framed by Birdsong.  The court noted that Birdsong provided 31 articles appearing in the *Philadelphia Daily News* and the *Philadelphia Inquirer* that reported on the commission of the homicides and shootings by Petitioner and his brother Anthony; the FBI search that resulted in their apprehension; other crimes with which they were charged; their drug-related activities; and

the forfeiture of Petitioner's property as drug proceeds.  *Birdsong-I*, 650 A.2d at 31.  The court

found, however, that Birdsong had not met his burden to show that the substance of the articles

were sensational, inflammatory, and slanted towards conviction; that they revealed his prior

criminal record or referred to confessions, admissions, or reenactments of the crime; or that the

publicity was derived from police and prosecuting officer reports.  *Id.*  The court found that because

the pre-trial coverage had not been shown to be prejudicial, his claim that trial counsel was

ineffective for failing to request a change of venue had no arguable merit.  *Id.*  Alternatively, the

court determined that Birdsong did not establish the prejudice component of his ineffectiveness

challenge concerning this failure to seek a change in venue.  The court found that he did not show

that there was a reasonable likelihood of a different outcome of the proceedings had counsel made

the request for a change of venue.  *Id.* at 32.

     As noted above, Petitioner faults the state court's analysis as to the prejudice prong, as he

believes the record made clear that he had waived his right to a jury trial based on the pretrial

publicity and that he would not have "needed" to make this waiver had counsel reasonably litigated

the venue issue.  (Pet'r Br. at 36.)  But the *Strickland* analysis does not look to whether a particular

election by the client --- such as to proceed by way of a bench trial rather than a jury trial --- was

impacted by counsel's allegedly deficient performance.  Rather, it is whether there is a reasonable

probability that "the outcome" of the proceeding, e.g., the guilt or penalty phase finding, would

have been more favorable to the defendant.

     This same problem also plagues Petitioner's challenge as to the state court finding

concerning the failure of trial counsel to have requested a change in venue in light of the electronic

media.  On PCRA review, Petitioner faulted appellate counsel for not mentioning the electronic

media coverage in her argument that trial counsel was ineffective for failing to move for a change

of venue.   He contended that the television and radio publicity about the crime and his apprehension in Florida was inflammatory and sensational, and that it revealed his prior criminal record.   The state court noted, however, that trial counsel explained in the PCRA hearing that he calculated a change of venue to be very harmful to Birdsong's interests.   He explained that he feared a venire panel from a more remote area would have been more "horrified" by the facts of the crime than one from an urban area like Philadelphia.   (N.T. 9/13/99 at 179-81.)   The state court concluded that because trial counsel's strategy was reasonable as to the decision not to seek a change in venue, the claim of appellate counsel ineffectiveness for failure to assert trial counsel's ineffectiveness necessarily fails.

Birdsong has not impeached these state court findings in any way.   He suggests that the state court ruling cannot stand because the state court erroneously believed that the record documented only *Anthony* Birdsong's concerns about pretrial publicity and not Petitioner's and therefore improperly failed to accept that pretrial publicity influenced his decision to waive his constitutional right to a jury trial.   (Pet'r Reply at 11.)   He argues that the waiver of his right to a jury trial "in itself establishes prejudice."   (*Id*. at 14.)   But it does not establish prejudice as described in *Strickland*.   We do not agree with his position that "had trial counsel moved for a change of venue to a county where a fair and neutral jury with no prior knowledge of the Petitioner or the crimes would have decided the case, there is a reasonable probability that the outcome of the guilt …phase[] would have been different."   (*Id*. at 15.)   Similarly, we do not agree that "[h]ad appellate counsel presented [the electronic media] evidence on direct appeal, there is a reasonable probability that Petitioner's direct appeal ineffectiveness claim for trial counsel's failure to move for a change of venue would have been successful."   (*Id.* at 16.)   What Petitioner attempts to portray

as a "reasonable likelihood" of a more favorable verdict simply is not a "reasonable likelihood" in a *Strickland* sense.  We cannot recommend relief on this claim concerning venue.

### E.    Claim that Commonwealth withheld evidence in violation of Due Process (*Brady* claims)

In Claim VIII, Birdsong asserts a violation of his Fourteenth Amendment due process rights based on the Commonwealth's alleged failure to turn over certain evidence favorable to his case.  As set out in *Brady v. Maryland*, 373 U.S. 83 (1963), the prosecution must produce to a defendant evidence that is material either to guilt or to punishment.  Favorable evidence subject to this mandate includes both exculpatory and impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985).

Materiality under *Brady* is measured by whether there was a reasonable probability the evidence would have changed the result, although a showing of materiality "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal[.]"  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).  A conviction would be reversed on the grounds of a *Brady* violation only if the defendant showed that the favorable evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Id.* at 435.  The defendant has the burden of establishing a *Brady* violation, that is to say that he must prove that the evidence was (1) suppressed, (2) favorable to the defense, and (3) material to either guilt or punishment.  *Brady*, 373 U.S. at 87.

Birdsong specifically alleges here that his due process rights were violated as recognized in *Brady* when the Commonwealth allegedly withheld the following evidence: (1) threats made and incentives offered to witness Andre Kinard, (2) incentives to other Commonwealth identification witnesses, (3) surveillance video, and (4) the results of blood and saliva tests. (Pet.,

Doc. 9, at 73–80). Birdsong first asserted these claims in state court on PCRA review and they were developed to some extent in evidentiary hearings.[9] Ultimately, the state court found that either the proffered evidence did not exist or would not have made a difference at Petitioner's trial. We proceed to consider each alleged *Brady* violation.

### 1.    Andre Kinard

Petitioner contends that the Commonwealth withheld the fact that eyewitness and surviving shooting victim, 16-year old Andre Kinard, was incentivized to testify, a fact that Petitioner could have used at trial to impeach him and undermine the credibility of Kinard's account at trial that he saw Petitioner shoot James Bagwell, the first victim, in the back of the head, before Kinard turned to flee and was shot from behind. (Pet'r Br., Doc. 25, at 92.) Birdsong later "learned" that prior to trial, Kinard had been unable to identify the person who shot him, allegedly due to his crack cocaine use at the time of the shooting. Birdsong also allegedly came to learn that Kinard attributed his identification of Birdsong as the person who shot him to Commonwealth threats to charge him with drug and weapons offenses if he did not testify at Birdsong's trial and incriminate him. (Pet., Doc. 9, at 73-75.) Birdsong obtained an affidavit from Kinard that he submitted to the PCRA Court, and Kinard was brought to a PCRA hearing in Birdsong's case. In what the state court characterized as a recantation of his trial testimony,[10] Kinard testified at the PCRA hearing on

---

[9]  To the extent that Birdsong was not satisfied with what he obtained through discovery in state court, we note that he moved for discovery in connection with his pending habeas petition, specifically as to the *Brady* claims comprising Claim VIII. (Doc. 62.) He sought production of the complete files of the Philadelphia Police Department and materials from the District Attorney's Office's files relating to "statements by or contacts with Commonwealth witness Andre Kinard; payments, in kind-consideration [sic], promises of consideration, or other potentially coercive support given to witnesses; electronic surveillance of Petitioner, Petitioner's co-defendant, or witnesses; and saliva and blood testing." (Doc. 62 ¶ 12.) The Court denied the motion, characterizing the effort as a "fishing expedition." (Doc. 89 at n.1.)

[10]  At trial, Kinard was asked about an initial police statement in which he was asked the compound question, "Did you see who shot your cousin [James Bagwell] or shot you?," and he answered

January 7, 2000 that he was, in fact, unable to identify who shot him. *Birdsong-II*, 24 A.3d at 327; N.T. 1/7/00 at 7, 22-23.

The PCRA Court concluded that Kinard's testimony at the evidentiary hearing was not credible. The Pennsylvania Supreme Court found this credibility determination to be supported by the record, "[g]iven Kinard's testimony that he perjured himself at trial, and the factors surrounding his recantation," including the fact that he did not advise anyone that his testimony at Birdsong's trial was perjured until he himself had been sentenced to life imprisonment for his role in a murder. *Birdsong-II*, 24 A.3d at 327 & n.6. The court commented that recantation testimony is "exceedingly unreliable," and that "there is no less reliable form of proof, especially when it involves an admission of perjury." *Id.* at 327 (citations omitted). Noting that Birdsong had not described how this evidence "would have affected the outcome of his trial," however, the court found that the proffered evidence as to the Commonwealth's actions with respect to Kinard did not "meet the materiality test." *Id.* at 327-28.

The Pennsylvania Supreme Court did not engage in an unreasonable application of the *Brady* standard as to the withheld "evidence" of Kinard's account of the shooting or subsequent Commonwealth threats to charge him with drug and weapons offenses. It was not unreasonable for the state court to find as a matter of fact that Kinard's PCRA recantation testimony was unreliable, and Petitioner has not overcome the presumption of the correctness of this factual finding by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). With this factual finding in place, we cannot say that the state court engaged in an unreasonable application of federal law

---

"no." Kinard explained at trial that his answer was directed to the second part of the question, as he "saw who shot James" but did not see who shot him (Kinard) because his back was turned. N.T. 10/23/89 at 210.

in determining that there was no *Brady* violation.  Even if the Commonwealth disclosed to the defense at trial either that Kinard reported that he had been under the influence of drugs at the time of the shooting and may not be able to identify who shot him or that charges had been threatened against him for his drug and weapons offenses, there was no reasonable probability that Birdsong would have escaped conviction.  As the court noted in the prejudice analysis of another claim, "the undisputed evidence, including numerous eye-witnesses, placed [Birdsong] at the scene of the crime as the shooter and the rapist."  *Birdsong-II*, 24 A.3d at 337 (quoting PCRA Court Opin., 3/25/04, at 19-20).[11]  As the state court reasonably rejected the *Brady* claim regarding Kinard's testimony on materiality grounds, habeas relief cannot be granted here.  *See* 28 U.S.C. § 2254(d).

## 2.      Other identification witnesses

Birdsong additionally contends that the Commonwealth withheld from the defense the existence of offers – of immunity, cash payments, free housing, and money for expenses – to other witnesses who testified on behalf of the Commonwealth at trial and identified Petitioner as the shooter.  (Pet., Doc. 9, at 75.)  He argues that, had the defense been aware that witnesses had received these benefits from the Commonwealth, he would have insisted on a jury trial, as he believes that this information would have been more likely to lead a *jury* rather than a *judge* to find the Commonwealth influence on the witness to be undue.  He documented the benefits provided to witnesses through an affidavit-declaration submitted by Gracie Covington, who was housed with testifying witness Kim Glenn.  Although Ms. Covington ultimately was not called by the Commonwealth at trial as Ms. Glenn was, her statement recounted that she and Ms. Glenn

---

[11]   As Respondents remind us in their Response to the petition, "Kinard was but one of seven different eyewitnesses who positively identified petitioner as the shooter"; following the shooting, Petitioner was observed with blood on his hands, shin, and leg and with an empty Colt .45 magazine clip in his jacket; and when he encountered police near the crime scene, he acted nervous and ran away, ultimately fleeing to Florida.  (Resp. at 171-72, citing N.T., 10/25/89.)  Kinard's eyewitness testimony was hardly the lynchpin of the case against Petitioner.

were maintained in Commonwealth-sponsored housing, even after others were removed due to drug use in the hotel, on the condition that they testify against Birdsong if called to do so.[12]

At trial, Kim Glenn identified Petitioner as the man who rang the doorbell before coming inside and shooting. *Birdsong-I*, 650 A.2d at 29. She testified that she recognized him as the person for whom she had previously sold drugs for a year and a half. *Id.* In a subsequent affidavit-declaration she gave to Birdsong's PCRA counsel in 1997, she also explained that she felt unsafe after the shootings and acknowledged that the Commonwealth offered her placement in the witness protection program and financial assistance for relocation. *See* Doc. 9 at 75 (quoting from affidavit found at PCRA App. 12). She stated that it was "because of" these promises of assistance that she agreed to cooperate with the Commonwealth and testify against Birdsong and his brother. (*Id.*) Ms. Glenn elaborated that she and several other witnesses were housed in hotels, even though police had suspicions they were getting high in the rooms. (*Id.* at 76.) Ms. Glenn and fellow witness Covington were then moved to another hotel after the others were kicked out. (*Id.* at 75.) According to Ms. Glenn, the Commonwealth also provided money for train tickets. (*Id.* at 76.) Ms. Covington, formerly known as Gracie Moore, largely corroborated this account in her 1997 affidavit-declaration. She stated that witnesses were put up in a hotel and that they were promised full immunity because the Commonwealth "just wanted [Petitioner]." (*Id.* at 77 (citing PCRA app. 13).)

The state supreme court concluded that this evidence "would not have changed the result at trial" and thus was not material. *Birdsong-II*, 24 A.3d at 328. The court pointed out that none of the witnesses who received these benefits ever recanted their identification of Birdsong as the

---

[12] Neither Ms. Glenn nor Ms. Covington testified at the PCRA hearing. Petitioner sought out-of-state subpoenas to compel them to return to Philadelphia and testify but the PCRA Court denied him the necessary certificate of materiality to obtain such subpoenas. (Pet., Doc. 9, at 78.)

shooter, which we understand to imply that they would have held fast to their statements to police that Birdsong was the shooter, even in the face of cross-examination about benefits received from the Commonwealth.  The court also noted that the reason these individuals had to be placed in protection programs was due to their fear of returning to the neighborhood where the murder occurred after having identified Birdsong.  *Id.*  The court noted that if defense counsel had learned of this and opted to cross-examine these witnesses about these benefits in front of a jury as Petitioner envisions, he would have risked "rais[ing] the inference that [Birdsong] or one of his cohorts would retaliate," which would not have benefitted Birdsong.  *Id.*  In light of these circumstances, the court concluded that the undisclosed material was "not material."  *Id.*

Birdsong argues that the court applied the incorrect standard in determining that this evidence did not meet the materiality threshold under *Brady*.  He notes that the state court's finding about materiality was preceded by the observation that the evidence "would not have changed the result at trial in appellant's favor[.]"  He asserts that *Brady* does not require that the evidence be outcome determinative as suggested by the state court's language.  He also complains that the state court was not in a position to reasonably infer the impact of the testimony of these witnesses without the benefit of their actual testimony on PCRA review, which Birdsong was not able to secure when the PCRA Court refused to issue out-of-state subpoenas.  (Doc. 25 at 111.)

While Petitioner correctly states that establishing materiality under *Brady* does not require the evidence to be definitively outcome-determinative, a defendant must establish that there was "a reasonable probability" that the undisclosed evidence would have affected the trial.  *United States v. Bagley*, 473 U.S. 667, 682 (1985).  We would find, *de novo*, that Petitioner did not meet the *Brady* materiality standard as to warrant relief.  There is no reasonable probability that this evidence, if disclosed, would have resulted in a different outcome.  The offer of housing and

witness protection program accommodations to various eyewitnesses does not undermine our confidence in the guilty verdict as to Birdsong, since only one of those witnesses testified at trial, there was extensive evidence of Birdsong's guilt, and elucidation of witness protections given to Ms. Glenn would likely not have made her appear less credible but rather could have suggested that Birdsong was feared in his community.   We cannot recommend that habeas relief be granted on the *Brady* claim relating to the witness protection program benefits provided to certain witnesses.

### 3.    Surveillance video

Birdsong also alleges that the Commonwealth withheld "electronic surveillance" consisting of "tapes and transcripts" of internal communications of the Junior Black Mafia criminal organization (the "JBM") reflecting that organization's intention to "hit" a rival independent dealer, John Craig Haynes, who lived a few houses from the scene of the murders for which Petitioner was held responsible.    (Pet., Doc. 9, at 78-80).  Birdsong contends that the proximity of Haynes to the crime scene and the "fact" that he was a prospective target of the JBM provided an alternative to the Commonwealth's theory of what led to the rampage.  (*Id.*)  Birdsong attributes the Commonwealth's knowledge about this surveillance evidence to its role in a joint task force comprising Philadelphia and state police officers, the District Attorney's office, the Internal Revenue Service ("IRS"), the Drug Enforcement Agency ("DEA"), and the Federal Bureau of Investigation ("FBI"), all of whom were investigating the JBM during this time.  (*Id.* at 79.)  According to Petitioner there are tapes and transcripts from the task force's wiretaps that illustrate the JBM was organizing a hit on Haynes.  (*Id.*)  Petitioner alleges that evidence about the JBM and Haynes supports an alternative theory that the JBM accidentally attacked the wrong house, hitting the Johnson home instead of that of Haynes.  (*Id.*)

31

Birdsong presented this *Brady* claim with his other *Brady* contentions on PCRA review. He based his factual assertions on several newspaper articles from the time of the shooting, which reference police investigation of the JBM, and opinions in other state court cases that recounted evidence of a plan to "hit" Haynes a week prior to the attack on the Johnson home.  PCRA counsel argued at one of Birdsong's evidentiary hearings that the information about JBM activity was *Brady* material and that "[i]f the Commonwealth intercepted a communication where the JBM said we're going to do a hit on Haynes where they attribute that hit done on the 17th, they say, yeah, we did it, that was our attempt to get Haynes, that's material."  (N.T. 9/7/99 at 20.)  PCRA counsel explained that a particular FBI agent was "in the process of reviewing intercepts which were used in" one of the criminal investigations.  *Id.* at 17.  The PCRA Court extended the following invitations to counsel:

> You can go to that agent and find out that, in fact, that it covers, [sic] this case has something to do with this case, then I'll listen to you. Otherwise, you're just out there trying to ascertain whether or not it is, so it's up to you to do that.  It's your burden of proof on that issue.
> …
> Find out that there's some connection to this case, that's all I care about, and if there is, you can bring in the testimony and I'll listen and then I will weigh it as to whether or not it's exculpatory and whether or not it deserves the grounds for a new trial.  That will be my judgment.  However, you have to do the burden of proof that, in fact, it's connected somehow to this case.

*Id.* at 19, 21.  The PCRA record, however, is bereft of any such further evidence actually presented by Petitioner.  When the state supreme court considered this issue on appeal, therefore, it found that this claim "was properly rejected," as Birdsong "failed to prove [that] the evidence he sought exists[.]"  *Birdsong-II*, 24 A.3d at 328.

We cannot find anything unreasonable as a factual or legal matter as to the state court's disposition of this *Brady* claim.  Birdsong did not meet his burden to prove that any evidence

existed – much less that it was withheld by the Commonwealth – showing that wiretapped conversations concerned a plot to kill Haynes by going on a shooting rampage at his house or that the JBM acknowledged after the fact that the crimes committed at the Johnson home had been carried out by the JBM.  Petitioner has not shown by clear and convincing evidence that the finding by the state court that no such evidence existed was erroneous.  With this absence of supporting facts as to the existence of this evidence, the state court's rejection of this claim cannot be said to be unreasonable under *Brady*.  We cannot recommend habeas relief on this aspect of his *Brady* claim.

### 4.   Blood and saliva tests

Birdsong's final claim under *Brady* relates to the identity of the perpetrator of the rape. Making reference to samples of his blood and saliva that were taken on January 12, 1989 pursuant to a warrant, he asserts that analysis of these samples would be material to the rape charge but that the results were not provided to him.[13]  (Pet., Doc. 9, at 80.)  He supports this argument with Michael Birdsong's 1997 affidavit-declaration, in which he states that he "know[s]" Petitioner did not commit the rape "because [Michael] was the person who had sex with [Y.P.] that night."  (*Id.* & PCRA App. 10.)

At the state court evidentiary hearing, PCRA counsel recounted that the defense was never advised whether a laboratory analysis of Birdsong's bodily fluids showed "whether or not Mr. Birdsong is a secretor," that is, someone "who show[s] blood types in bodily fluids."  (PCRA N.T. 9/7/99 at 11.)   The Commonwealth represented at the hearing, however, that it "had no

---

[13]  Apart from the saliva and blood samples that Birdsong refers to here, samples of *semen* were taken from the rape victim and tested prior to Birdsong's trial.  The semen samples did not yield any blood that could have been typed to identify the source.  It is undisputed that the Commonwealth disclosed to the defense the results of *that* analysis.

documentation showing that any tests were done on the samples taken from [Birdsong.]" *Id.* at 12. *See also id.* at 14. The Commonwealth noted that while the blood sample might have been taken, "[i]t would not have been necessary to test the blood sample at that point given the circumstances of the case," *id.* at 14, where the semen samples found on the victim ultimately did not yield any blood that could have been typed with the defendant's in any way[.]" *Id.* at 12. PCRA counsel, however, argued that it was a violation of *Brady* for the Commonwealth to allow those samples to remain untested – notwithstanding the lack of a request by the defense for an analysis.[14] The PCRA Court rejected this claim, and the state supreme court determined that it did so properly. *Birdsong-II*, 24 A.3d at 328. The court noted that Birdsong failed to establish the existence of any comparative tests between the victim's semen samples and his bodily fluid samples that would have discredited the identification testimony from the victim that Birdsong committed this crime against her. Rather, the court accepted the Commonwealth's explanation that no testable blood groups were found in the semen taken from the victim, which *benefitted* Petitioner in that he was able to argue at trial that there was no physical evidence linking him to the rape. *Id.*

The state court did not engage in an unreasonable application of federal law in its application of *Brady*. Where analysis of the blood and saliva samples from Petitioner was not conducted – because it was determined that the samples could not have yielded any conclusive results when compared with the semen samples from the victim – there was no material evidence that could be said to have been withheld. The state court did not act unreasonably in rejecting this

---

[14] Trial counsel later testified that he chose not to challenge the Commonwealth's failure to test Petitioner's blood samples out of concern that "the results come back as another nail in the coffin." (N.T. 9/8/99 at 54, 56.) *See also Birdsong-II*, 24 A.3d at 335-36. Rather, the absence of test results enabled trial counsel to argue that there was no physical evidence that linked Birdsong to the rape. *Id.* at 328.

*Brady* claim.  We find no basis for the Court to grant relief on this – or any – of the *Brady* challenges presented by Petitioner.

### F.    Layered claim of ineffective assistance where trial counsel elicited testimony about Petitioner's prior bad acts

In Claim XI of his petition, Birdsong asserts that trial counsel was ineffective for eliciting testimony about his prior criminal activity during cross-examination of Commonwealth witnesses, Gregory Johnson, Monroe Clark, Y.P., and Kim Glenn.  (Pet'r Br., Doc. 25, at 122).  On cross-examination of Gregory Johnson, for example, counsel elicited testimony that several of the victims believed that Birdsong was the person who had pistol-whipped two occupants of the house a week earlier, on July 10, 1988, and demanded they stop selling drugs from the house.  *Birdsong-I*, 640 A.2d at 32.  Witnesses Monroe Clark and Y.P. also responded to questions from Birdsong's counsel that Gregory Johnson told them that it was Birdsong who had committed the earlier assault.  In addition, on cross-examination Kim Glenn testified that Petitioner was a drug dealer for whom she had sold drugs.  *Id.*  Birdsong argues that all of this testimony was prejudicial to his case and counsel was ineffective for eliciting it.

This claim of trial counsel ineffectiveness was one that *was* presented to that state court on direct review, and the Pennsylvania Supreme Court addressed the issue on the merits.  The court focused on the deficient performance prong and the reasonableness of counsel's strategy against the backdrop of the testimony of several witnesses who identified Birdsong at trial as the perpetrator of the horrific crimes.  The court noted that counsel's defense strategy was, first, to suggest someone else committed the crime – the two Jamaican men dropped off by the cab driver – but in light of the Commonwealth's "extensive" identification evidence,[15] his secondary strategy was to point to a motive for the eyewitnesses to have fabricated this accusation.  *Id.*  He did so by

---

[15] Six of these witnesses had previously known Birdsong.  *Birdsong-I*, 650 A.2d at 3.

attempting to establish the existence of a drug rivalry between Petitioner and the various people found in the Johnson house at the time of the shooting.  This included testimony concerning the prior pistol-whipping incident one week earlier in which the assailant expressed his disapproval of Johnson's drug-selling from that house.  Counsel used testimony regarding that incident to suggest that the victims of the pistol-whipping incident only decided to pin the shooting spree on Petitioner when others told them that Petitioner had been the disguised perpetrator of the earlier assault, for which he suggested they wanted revenge.  The court found that the testimony which discussed Birdsong's prior criminal activity was "necessary to establish a rational basis to explain why seven eyewitnesses, most of whom had previously known Appellant, would lie and accuse him of murder." *Id.* The court held that "[t]rial counsel's disclosure of Appellant's prior bad acts in order to show motive for the Commonwealth's witnesses to lie was a reasonable trial strategy, and thus, trial counsel was not ineffective for doing so." *Id.* at 33.

The state court's application of *Strickland* was not unreasonable. The court recognized "that trial counsel was faced with [a] dilemma": whether (or not) it was worth the potential prejudice to his client in the eyes of the factfinder "to hear about [Petitioner's] prior criminal activity in order to show a motive for the Commonwealth's witnesses to lie." *Birdsong-I*, 650 A.2d at 33.  This testimony was necessary, however, to provide a rationale for counsel's theory that the Commonwealth's witnesses were knowingly accusing Birdsong falsely.  Applying the "highly deferential" standard established in *Strickland*, Birdsong has not established that counsel performed deficiently as to strategy. The state court was not unreasonable in finding that he had not overcome the presumption laid out in *Strickland* that "counsel's conduct falls within the wide range of reasonableness" and "might be considered sound trial strategy." *Strickland v.*

*Washington*, 466 U.S. 668, 689 (1984).  Birdsong is thus not entitled to relief under § 2254 on this ground.

>**G.**    **Layered claim of ineffective assistance where trial counsel "failed to impeach important Commonwealth witnesses, pursued an implausible theory of defense and generally failed to test the Commonwealth's case"**

Finally, in Claim IX of his petition, Birdsong asserts that he received ineffective assistance of counsel when counsel "failed to impeach important Commonwealth witnesses, pursued an implausible theory of defense[,] and generally failed to test the Commonwealth's case."  (Pet'r Br., Doc. 25, at 100.)  More specifically, he argues that counsel was deficient: (1) for failing to call witnesses who would have impeached Gregory Johnson and Y.P. with prior statements about how they did not actually know Petitioner to be the perpetrator of the crimes against them; (2) for pursuing a poorly-investigated mistaken identity defense strategy, pointing to the Jamaicans who arrived by cab, rather than presenting the allegedly more plausible one of JBM involvement; and (3) as to the rape charge, for suggesting Y.P. had sex with Petitioner's brother Michael but without presenting evidence which would undermine her identification of Petitioner as the rapist.  Birdsong also alleges ineffective assistance of appellate counsel in failing to present these claims in the direct review.  (*Id.* at 104.)

As Petitioner recognizes, these claims of ineffective assistance of counsel were not among those presented in the direct appeal decided by the Pennsylvania Supreme Court.  When they were presented on PCRA review as nominally layered claims of ineffective assistance of counsel, the court found that the underlying ineffectiveness claims as to trial counsel had no merit, which doomed the claims as to ineffective assistance of appellate counsel.  *Id.*  We address each below.

>**1.**    **Failing to call witnesses to impeach key Commonwealth witnesses**

The first sub-claim of this ineffectiveness medley is the assertion that trial counsel did not call available witnesses who would have impeached the testimony of Commonwealth witnesses

Gregory Johnson, one of the shooting victims, and Y.P., the teenage girl who was raped. *Birdsong-II*, 24 A.3d at 334. At the trial, counsel vigorously cross-examined these witnesses, pointing out that their identifications of Birdsong were not done immediately after the crime and suggesting that both had motives to falsely implicate Birdsong in the crimes. *Id.* Counsel did not, however, call any witnesses to impeach them.

Birdsong asserts that there were three such persons who could have impeached Johnson and Y.P.'s identification testimony. Birdsong points to Ruben Brezeal and Gregory Moton, both of whom provided statements in the PCRA litigation representing that Johnson told them that he did not know who shot him. (Pet., Doc. 9, at 81-82, citing PCRA App. 45-46.) Birdsong also produced a statement of John Craig Haynes, who also said that Johnson told him he did not know who shot him and attributed his identification of Birdsong to pressure put on him by the police. (*Id.* at 82-83, citing PCRA App. 67.) In addition, Brezeal also added that Y.P. appeared confused as to who raped her and that he believed she was influenced by Johnson's identification of Birdsong as the assailant. Petitioner argues that counsel's failure to investigate or pursue the potential impeachment evidence offered by these witnesses was unreasonable and therefore ineffective assistance.

When it considered this claim on PCRA, the court found that the absence of these three impeachment witnesses did not prejudice Petitioner. The court noted that counsel did substantially cross-examine both Johnson and Y.P., significantly testing their credibility. The court observed that all that the reputed impeachment witnesses could offer with regard to Johnson was mere hearsay, recounting statements they said Johnson told them, and with regard to Y.P. even less meaningful conjecture about what the witness thought of Y.P.'s identification of Birdsong. *Id.* Moreover, as to Brezeal, the court noted that counsel testified at the PCRA hearing that he was

aware of him, and that he declined to present the proposed testimony in that he found Brezeal had his own credibility issues. *Id.* Thus, in the case of Brezeal trial counsel clearly made a tactical choice not to call the witness based on an assessment that he was not believable. Overall, the court concluded that the absence of the three witnesses from trial did not prejudice Birdsong because they either were not credible witnesses or they would not add anything to other proffered impeachment evidence besides conjecture and hearsay.

We do not agree with Petitioner that the Pennsylvania Supreme Court was unreasonable in its application of *Strickland* in finding that counsel was not ineffective for not investigating or calling the three witnesses. We note first that such a claim as to counsel's investigation is impossible to maintain as to Brezeal. The PCRA hearing record shows that trial counsel knew of and chose not to call Brezeal for the essentially tactical reason that he found him not a credible witness. Counsel's testimony at the PCRA hearing reflected that Brezeal told him he would not testify unless he was paid, which counsel found undermined his credibility. (*See* PCRA N.T. 9/13/99 at 154.) *Birdsong-II,* 24 A.3d at 334.[16] On this record, there was no reason for the state court to do anything other than apply the presumption, set out in *Strickland*, that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickand v. Washington*, 466 U.S. 668, 690 (1984). Birdsong has not demonstrated that the state court's resolution of this ineffectiveness claim concerning the tactical decision not to call Brezeal was unreasonable.

The PCRA Court concluded that the absence of the three witnesses – individually or in combination – did not prejudice Birdsong. Both Johnson and Y.P. had been cross-examined

---

[16] Birdsong does not dispute this fact, which is stated in the PCRA opinion, nor does he argue that counsel's tactical choice not to call Brezeal was ineffective assistance. Rather, he appears to erroneously assert that counsel was not aware of Brezeal. (Pet'r Br., Doc. 25, at 102.)

vigorously at trial.  These three additional proposed witnesses – Brezeal, Moton and Haynes – had significant credibility problems, and even if found to be credible, their proffered testimony did not add anything to the evidence already adduced in the trial.  *See Birdsong-II*, 24 A.3d at 334 (quoting PCRA Ct. Opin. 3/25/94 at 24, characterizing their contribution as nothing more than "hearsay, conjecture and unsubstantiated rumors").  Thus, the state court's finding that counsel was not ineffective for failing to call the additional three witnesses is not unreasonable.

### 2.    Pursuing an implausible theory of defense regarding alternative perpetrators

In the second component of the ineffectiveness claim asserted in Claim IX, Birdsong asserts that trial counsel was ineffective for arguing that two men of Jamaican origin, known only as "Tony" and "Mack," committed the crime.  This alternative perpetrator theory was built upon the testimony of a cab driver that he took two Jamaican men to the area of the crime and that one of them got out and disappeared into one of the houses while the other remained in the cab.  The cab driver's additional testimony about how he forced the remaining man out of the car so that he could take the injured Gregory Johnson to the hospital was corroborated at trial by Johnson's testimony.  (Pet., Doc. 9, at 84; *Birdsong-II*, 24 A.3d at 335.)  Birdsong characterizes the theory of the Jamaican men as the alternative perpetrators as "implausible and unsupported" and contends that a much more compelling alternative perpetrator theory was available to counsel: that the crime was committed by the JBM, the gang about which Petitioner also sought alleged *Brady* material. (Pet., Doc. 9, at 84.)

Birdsong presented this ineffectiveness claim in his PCRA proceedings, and trial counsel was questioned at the PCRA hearing about his strategy and decisionmaking regarding this aspect of the defense.  The state courts, however, concluded that pursuing the Jamaicans theory, rather than the JBM theory, was not ineffective.  First, as the Pennsylvania Supreme Court accepted on

appeal, trial counsel conducted a reasonable investigation regarding alternative perpetrators and never uncovered the JBM theory.  The state court attributed this to the fact that Birdsong himself never mentioned it and counsel received very little cooperation from witnesses in attempting to mount a defense. *Birdsong-II*, 24 A.3d at 335.  Second, the court found that in actuality there was no evidence specifically connecting the JBM to this crime. *Id.* The best that Petitioner could produce on PCRA review amounted to the conjecture of some witnesses and victims that they thought the JBM carried out the crimes.  *Id.* The state court thus found that counsel was not unreasonable to pursue the defense he did, as it was at least supported by some direct evidence in the cab driver's identification, whereas nothing directly linked the JBM to this crime.

We cannot say that the state court adjudication of this aspect of the *Strickland* claim on PCRA review was unreasonable. The PCRA Court credited trial counsel's testimony that neither Birdsong nor reputed eyewitnesses in the neighborhood gave him any information to identify the perpetrators of the crime – and that no one suggested JBM involvement.  The state court concluded that counsel conducted a reasonably thorough investigation under those circumstances, and that he reasonably considered the Jamaican theory to present the best alternative explanation for who committed these crimes. *Birdsong-II*, 24 A.3d at 335.  The record does not persuade us that trial counsel's investigation and decisionmaking regarding alternative perpetrators was less than adequate.  Birdsong has not pointed to any particular evidence tying the JBM to this specific crime, which suggests that there were not many particularly helpful facts for trial counsel to uncover in advance of trial pointing to the JBM.  The state court properly deferred to counsel's strategy following his unsuccessful attempts to obtain other useful eyewitness information.  Petitioner has not met his burden to show that this decision of the court is an unreasonable application of *Strickland.*  We also note that this layered claim would have required him to further establish the

41

deficient performance by appellate counsel in omitting this trial counsel IAC claim from the direct appeal. As he cannot do so, no relief is warranted on this aspect of Claim IX.

### 3.   Failing to more thoroughly argue and present evidence that Birdsong's brother Michael committed the rape

The final contention of Claim IX concerns trial counsel's stewardship as to the rape charge. While acknowledging that trial counsel attempted to present the theory that *Michael* Birdsong, another of his brothers, committed the rape, Petitioner contends that counsel failed to effectively present *all* of the available evidence of Michael's guilt. *Birdsong-II*, 24 A.3d at 336. He recounts that, prior to trial, Michael acknowledged to Petitioner's trial counsel that he had had sex with the victim on the night of the crime. (Pet., Doc. 9, at 91, citing PCRA N.T. 9/8/99 at 47-51.) Counsel accordingly called Michael Birdsong to the stand during the defense case at trial. Unfortunately, Michael then invoked his Fifth Amendment right to remain silent, at which point counsel could only ask Justice Stout to make note of the physical resemblance of the two Birdsong brothers. *Id.* Counsel at other points also utilized eyewitness testimony that placed Michael Birdsong near the scene of the rape,[17] and made note of the fact that the physical evidence was inconclusive as to who had sexual contact with Y.P.[18] (N.T. 10/26/89 at 541-44.)

Birdsong contends that counsel should have done more to develop this theory and made further attempts to introduce in some manner the admission from Michael that he had had sex with the sixteen-year-old victim. He argues that there were a variety of other means that trial counsel could have employed to attempt to get Michael's admission into evidence once he invoked his

---

[17] For reasons not clear from the record, it was counsel for co-defendant *Anthony* Birdsong who called witness James C. Haynes to testify to his observation of Michael Birdsong walking in the park where the rape occurred.

[18] A rape kit performed on Y.P. found the presence of semen but yielded no samples capable of further blood or DNA testing. *Birdsong-II*, 24 A.3d at 335.

Fifth Amendment rights. (Pet., Doc. 9, at 91.)   The state court concluded that trial counsel effectively pursued the theory that Michael committed the rape. The court reasoned that by putting Michael on the stand, counsel did essentially all he could to elicit the testimony regarding Michael's role and that Michael's invocation of his Fifth Amendment rights was beyond his control. *Birdsong-II*, 24 A.3d at 336. The court also noted that counsel testified at the PCRA hearing that because there had been no match between Petitioner's samples and the rape kit samples, he could argue that the results showed only that *someone* had sex with the victim. *Id.* at 335-36. With respect to the prejudice prong, the court also noted that "any challenge trial counsel could have raised regarding the rape kit or Michael's culpability would have paled in the face of the other evidence linking appellant to the crimes." *Id.* at 336.

Petitioner asserts that this conclusion of the state court was an unreasonable determination of facts and application of law and that trial counsel's representation was ineffective. We cannot agree. Petitioner would have faced significant hurdles in admitting Michael's alleged admission to Attorney O'Keefe – Petitioner's counsel – concerning his alleged sexual contact with Y.P. Michael's private counsel was present at trial and counseled his client. The court held a sidebar discussion, following which it appears Attorney O'Keefe understood that Michel would not testify for them. Petitioner has not met his substantial burden to show there was more that Attorney O'Keefe could have done. Moreover, given that this claim is presented in the posture of ineffective assistance of appellate counsel for failing to pursue this claim on direct appeal, we can certainly say that the state court reasonably determined that pursuit of this claim of ineffective assistance as to the rape charge would have had little effect on the outcome of the trial as a whole, given that Birdsong faced more serious sentences of life in prison or even capital punishment. The state court's finding that Petitioner failed to establish the prejudice component as to the allegedly

ineffective assistance of trial counsel was not unreasonable given the circumstance of his case and this finding thus justified the conclusion that appellate counsel was not ineffective for failing to continue to pursue this issue on appeal.

## IV.    CONCLUSION

Birdsong's claims do not provide a basis for habeas relief in this Court as all of the claims presented were reasonably adjudicated by the state court, largely as layered claims of ineffectiveness, and found to be without merit. As we set forth above, Claim III fails in that competent counsel need not have filed a motion for change of venue.  Claim IV fails in that there was no basis for counsel to raise, post-trial, the failure of Justice Stout to have recused herself. Claim VII fails where Birdsong was not denied counsel of his choice by virtue of the Commonwealth's forfeiture actions against him.  No relief is warranted on Claim VIII where the evidence allegedly withheld by Commonwealth – concerning Andre Kinard, incentives to other Commonwealth witnesses, surveillance of the JBM, and studies of blood and saliva samples – either did not exist or was not material as defined in *Brady.* Claim IX offers no relief in that the unrelated assertions presented there concerning defense strategy did not reflect deficient performance by counsel.  The claim asserted as Claim X provides no relief where Birdsong was not harmed by a joint trial and there was no basis upon which to request a severance from his brother's trial.   Finally, Claim XI similarly fails where trial counsel's strategic decisions, in this case, as to eliciting information on Petitioner's prior bad acts when questioning a witness, were reasonable in the circumstances.  We therefore cannot recommend that habeas relief be granted on any of the grounds raised.

Pursuant to Local Appellate Rule 22.2 of the Rules of the United States Court of Appeals for the Third Circuit, at the time a final order denying a habeas petition is issued, the district court

judge is required to make a determination as to whether a certificate of appealability ("COA") should issue.  A COA should not issue unless the petitioner demonstrates that jurists of reason would find it to be debatable whether the petition states a valid claim for the denial of a constitutional right.  Here, for the reasons set forth above, we do not believe a reasonable jurist would find the Court to have erred in denying the present petition. Accordingly, we do not believe a COA should issue. Our Recommendation follows.

### RECOMMENDATION

AND NOW, this 28th  day of October, 2021, it is respectfully RECOMMENDED that the petition for a writ of habeas corpus be DENIED. It is FURTHER RECOMMENDED that a certificate of appealability should NOT ISSUE, as we do not believe that Petitioner has demonstrated that reasonable jurists would debate the constitutional validity of the claims asserted in the petition and addressed herein.

Petitioner may file objections to this Report and Recommendation. *See* Local Civ. Rule 72.1. Failure to file timely objections may constitute a waiver of any appellate rights.

BY THE COURT:

/s / David R. Strawbridge, USMJ
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE